IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


Jean Coleman, et al.,                   :       CIVIL ACTION
                                         :       NO. 10-07421
            Plaintiffs,                  :
                                         :
      v.                                 :
                                         :
Pottstown School District,               :
                                         :
            Defendant.                   :


FINDINGS OF FACT, STATEMENTS OF APPLICABLE LAW,
CONCLUSIONS OF LAW, AND ANALYSIS

EDUARDO C. ROBRENO, J.                              November 22, 2013

TABLE OF CONTENTS

I.   INTRODUCTION AND PROCEDURAL HISTORY ...................... 3

   A.  Administrative Due Process Complaint ................... 3
   B.  Administrative Due Process Hearing ...................... 4
   C.  Plaintiffs' Case in U.S. District Court ................ 5
   D.  Motions to Supplement the Record ....................... 5
   E.  Parties' Proposed Findings of Fact and Conclusions of Law 7


II.  FACTUAL BACKGROUND ...................................... 8

   A.  Historical Facts ....................................... 8
     1)  R.J.'s Early Years in Baltimore ...................... 8

     2)  November 2005 Assessments and March 2006 IEP .......... 9

     3)  Move to Pottstown and August 2006 Interim IEP ........ 10

   B.  Findings of Fact on Contested Issues ................... 12
     1)  One-on-One and Lindamood-Bell Style Instruction at
     Pottstown School District .............................. 13

     2)  Instruction, Accommodations, and Modifications in
     Pottstown School District IEPs .......................... 14

     3)  Transition Planning at Pottstown High School ......... 14

     4)  Measurable Goals and Progress Monitoring in R.J.'s
     October 2006 and October 2007 IEPs ...................... 15

5)   Pottstown School District's Response to Student's
Behavioral Issues ......................................... 16

6)   Academic Gains in Identified Areas of Concern, September
2006 through May 2008 ..................................... 19


III.   STATEMENT OF APPLICABLE LAW ........................... 25

A.   Standard of Review of Hearing Officer's Decision and
Burden of Proof.............................................. 25
B.   FAPE Standard under the IDEA ........................... 27
C.   Procedural Violations of the IDEA and Challenging the
Substantive Contents of an IEP ............................. 31
D.   New Testing Requirements for In-Transferring Students with
Existing IEPs .............................................. 33
E.   Monitoring Requirements under the IDEA ................ 33
F.   Treatment of Behavioral Issues under the IDEA ......... 34
G.   Transitional Services Requirements under the IDEA ...... 36
H.   Extended School Year (ESY) Services Requirements under the
IDEA 38
I.   Compensatory Education ................................. 38
J.   Tuition Reimbursement Standard ........................ 40
K.   Statutory Framework of Plaintiffs' Claims under Section
504 of the Rehabilitation Act and the Americans with
Disabilities Act ........................................... 43


IV.  STATUTE OF LIMITATIONS: A THRESHOLD ISSUE ............... 45


V.   ANALYSIS AND CONCLUSIONS OF LAW ON PLAINTIFFS' SPECIFIC
DENIAL OF FAPE CLAIMS....................................... 47

A.   Reevaluation Upon Enrollment in Pottstown School District
47
B.   No denial of FAPE based on provision of part-time learning
support rather than full-time learning support or private
placement .................................................. 48
C.   No denial of FAPE based on lack of "consistent one-on-one
instruction"............................................... 49
D.   No denial of FAPE for failure to address ongoing
behavioral issues .......................................... 50
E.   No denial of FAPE based on failure to identify secondary
exceptionality of "other health impairment" based on R.J.'s
ADHD 52
F.   No denial of FAPE based on inadequate or insufficient IEP
goals ...................................................... 53
G.   No denial of FAPE based on inadequate progress monitoring
56

H.  No denial of FAPE based on inadequate instruction, accommodations, and modifications in R.J.'s IEPs............ 57
I.  No denial of FAPE based on insufficient transition planning and programming................................... 57
J.  No denial of FAPE based on denial of extend school year (ESY) services.......................................... 58
K.  No denial of FAPE based on inadequate social skills training...................................................... 60

VI. CONCLUSION ........................................... 62

I.   INTRODUCTION AND PROCEDURAL HISTORY

A. Administrative Due Process Complaint

On May 13, 2009, Jean and David Coleman ("Parents"), on behalf of their adopted son, R.J., (collectively, "Plaintiffs[1]"), filed an administrative due process complaint against Pottstown School District ("Defendant") alleging that it had denied a free, appropriate public education ("FAPE") to R.J. during the 2006-07, 2007-08, and 2008-09 school years. See Pennsylvania Special Education Hearing Officer's Decision 2, Sept. 10, 2010, ECF No. 15-1 (hereinafter "Admin. Decision").

The administrative complaint was dismissed without a hearing on June 18, 2009, as the hearing officer found that Parents lacked standing to raise a claim under the Individuals with Disabilities Education Act (IDEA). Id; see also Pls.' Proposed Findings of Fact and Conclusions of Law ¶ 6, ECF No. 52 (hereinafter "Pls.' Proposed Findings"). Plaintiffs appealed to

---

[1] Parents originally raised an administrative complaint on student R.J.'s behalf. However, in appealing the outcome of the administrative proceeding in federal court, R.J. and Parents are both named plaintiffs.

the U.S. District Court for the Eastern District of Pennsylvania. Id. ¶ 7. The Court remanded the case for an administrative hearing based on the Court's finding that, under the circumstances, Parents met the standing requirements to seek reimbursement for educational expenditures made on R.J.'s behalf. Id. ¶ 8.

## B. Administrative Due Process Hearing

On remand, an administrative hearing was convened on March 15, 2010 to hear evidence on Defendant's motion to preclude claims predating May 12, 2007 because of IDEA's two-year statute of limitations. Id. ¶ 11. On April 13, 2010, the Hearing Officer determined that Plaintiffs had established an exception to IDEA's statute of limitations. Id. ¶ 13. Accordingly, Plaintiffs were to be permitted to present substantive evidence of all the events presented in their due process complaint, including those dating back to the beginning of the 2006-07 academic year. Id. ¶ 13.

Four substantive administrative due process hearings were held on May 18, May 19, August 16, and August 17, 2010. Id. ¶ 10. Based on the evidence presented at these hearings, including a substantial documentary record of R.J.'s academic and behavioral history, the Hearing Officer issued a decision on September 24, 2010 finding that Defendant had not denied R.J. a

FAPE, thus denying all of Plaintiffs' claims. Admin. Decision at
15.

C. Plaintiffs' Case in U.S. District Court

On December 21, 2010, Plaintiffs filed a civil action in
U.S. District Court against Defendant, claiming that the
District failed to provide R.J. with a FAPE during the 2006-07,
2007-08, and 2008-09 academic years in violation of the IDEA,
Section 5 of the Rehabilitation Act, and the Americans with
Disabilities Act (ADA). See Compl., ECF No. 1; see also Am.
Compl., ECF No 9.

D. Motions to Supplement the Record

On April 18, 2011, as part of this ongoing litigation,
Plaintiffs propounded upon Defendant a discovery request for
R.J.'s academic and behavioral record. See Pls.' Proposed
Findings ¶ 21. In response to this request, Defendant produced,
for the first time, voluminous documentation of R.J.'s
educational record. Id. ¶ 22.

On August 15, 2011, Plaintiffs filed a Motion to Supplement
the Administrative Record with various behavioral, academic, and
discipline records; representative samples of R.J.'s academic
work; and correspondence between various District personnel and
Plaintiff R.J.'s adopted brother/advocate, Michael Coleman,
which had been produced by Defendant. See Pls.' Mot. Supplement
R., ECF No. 28. The Court denied the first Motion to Supplement

without prejudice on August 19, 2011, ordering Plaintiffs to file an amended Motion with an attached expert report. See Order Denying Mot. Supplement R., Aug. 19, 2011, ECF No. 29.

Plaintiffs filed an Amended Motion to Supplement the Administrative Record on September 2, 2011, this time attaching expert testimony from psychologist Dr. Nancy Bloomfield. See Pl.'s Am. Mot. Supplement R., ECF No. 30. The Court issued an order on February 21, 2012 allowing the Plaintiff to supplement the administrative record with Exhibits E, F, I, H, and J of Plaintiffs' Amended Motion in light of the guidance for allowing supplementation of an administrative record in Antoine M. v. Chester Upland Sch. Dist. 420 F. Supp. 2d 396, 402 (E.D. Pa. 2006) (Robreno, J.). See Order, Feb. 21, 2012, ECF No. 35. The Court denied admission of Ms. Bloomfield's expert report, though the Court provided that an amended report might be resubmitted. Id. An amended report was submitted to the Court on August 15, 2012. See Pls.' Am. Expert. Report, ECF No. 43.

On July 26, 2012, Plaintiffs filed another Motion to Supplement the Administrative Record to provide additional context to previously submitted correspondence between Mr. Coleman and Pottstown School District personnel. See Pls.' Mot. Supplement the R., ECF No. 41. This Motion was granted by the Court on January 23, 2013. See Order Granting Pls.' Mot. Supplement the R., ECF No. 56.

On September 21, 2012, the Court held a hearing allowing both sides to present testimony of expert witnesses in the areas of school psychology and developmental psychology. See Hr'g Tr., 7, 43, ECF No. 50. This testimony related to R.J.'s behavioral history and academic progress throughout the years in question. Plaintiffs' witness, Dr. Nancy Bloomfield, as well as Defendant's witness, Dr. Samuel J. Brooks testified at the hearing. Michael Coleman also testified to explain the payment arrangement that he and Parents had with the private Lindamood-Bell program where R.J. received instruction in 2008-09.

E. Parties' Proposed Findings of Fact and Conclusions of Law

Following the September 21, 2012 hearing, Plaintiffs and Defendant submitted their proposed findings of fact and conclusions of law on November 15, 2012 and December 5, 2012, respectively.[2] The case is now ripe for disposition. The Court has reviewed the parties' proposed findings of fact (ECF No. 52 and 55), the supplemented administrative record, the Decision of Pennsylvania Special Education Hearing Officer Cathy Skidmore (ECF No. 15-1), transcripts of the 2010 administrative due process hearings, and other supplementary materials including

---

[2] On November 20, 2012, Plaintiffs filed a Motion to Amend and Correct their proposed findings of fact and conclusions of law. See Pls.' Mot. Am. Correct, ECF No. 53. In light of the fact that Plaintiffs had already received a ten day extension of their original deadline, see Order Granting Extension, Nov. 02, 2012, ECF No. 49, and because Plaintiffs have failed to show good cause for additional amendments, this motion to amend will be denied.

the testimony and expert reports of Dr. Bloomfield and Dr.
Brooks, and the testimony of Michael Coleman. Upon examination
of this extensive record, the Court now makes the following
material findings of fact.

II.  FACTUAL BACKGROUND

A. <u>Historical Facts</u>

1)    <u>R.J.'s Early Years in Baltimore</u>

Before entering the Pottstown School District in
Pennsylvania, R.J. resided in Baltimore, Maryland, where he was
born on April 23, 1991. <u>See</u> Admin. Decision, Findings of Fact
("Admin. FOF") ¶ 1, ECF No. 15-1. Between 1999 and 2001, R.J.
experienced a number of different emotional and physical
traumas, including a depressed skull fracture resulting from
being struck with a metal pole, the death of a brother, and the
incarceration of a parent. Admin. FOF ¶ 2.

R.J. attended public school in Baltimore from kindergarten
through the beginning of the ninth grade. Admin. FOF ¶ 1. In
second grade, R.J. was identified as eligible for special
education on the basis of a specific learning disability. <u>Id.</u>

An educational evaluation conducted in the spring of 2001
revealed well-below grade level academic performance in reading,
math, and written language. Admin. FOF ¶ 3. R.J. also received
psychiatric diagnoses of Reactive Attachment Disorder,
Dysthymia, Post-Traumatic Stress Disorder, and Obsessive

Compulsive Personality Disorder. Id. Consequently, R.J. was recommended to be reclassified to suffering from serious emotional disturbance. Id.

R.J. received special education to address his emotional disturbance and specific learning disability throughout his middle school career, from September 2002 through May of 2005. Admin. FOF ¶ 4. R.J.'s behavior had an adverse effect on his academic performance throughout this time period. Id.

### 2) November 2005 Assessments and March 2006 IEP

R.J. entered high school in Baltimore at the start of the 2005-2006 school year. Admin. FOF ¶ 6. He received a series of behavioral, psychological, and educational assessments in November 2005. Id.

A neuropsychological evaluation under the Wechsler Intelligence Scale for Children revealed R.J's overall intellectual functioning to be within the low-average range. Admin. FOF ¶ 7. Based on those results, the evaluation recommended: educational aids including intensive intervention to address his specific learning disorder and monitoring of emotional functioning; a phonics-approach to reading such as Lindamood-Bell; a speech/language evaluation; small class settings; transition planning; teaching skills and strategies in the areas of organization, self-monitoring, coping and problem-

solving, as well as social skills; and modifications to and accommodations within the curriculum. Admin. FOF ¶ 10.

At that time, R.J. also received a behavioral assessment indicating that he exhibited behaviors of concern in a school setting in the areas of attention, aggression, depression, atypicality, withdrawal, and learning problems. Admin. FOF ¶¶ 8, 9. This evaluation also suggested that R.J. met the criteria for Attention Deficit Hyperactivity Disorder ("ADHD"), Inattentive Type. Id.

R.J.'s Individualized Education Program ("IEP") team in Baltimore developed a new IEP in March of 2006. Admin. FOF ¶ 11. R.J. was classified as possessing a specific learning disability and present educational levels were set forth in reading, mathematics, and written language. Id. The March 2006 IEP included annual goals for transition planning, reading (including decoding), math, written language, as well as coping and social skills. Id. The IEP also contained a functional behavioral assessment ("FBA") relating to verbal and physical threats to peers and students. Id.

R.J. was placed in a private school for a short time at the end of the 2005-06 school year where he reportedly adapted well but required redirection at times. Admin. FOF ¶ 12.

    3)    Move to Pottstown and August 2006 Interim IEP

During the late spring of 2006, R.J.'s family situation in Baltimore deteriorated to the point where he could no longer reside there. Id. On July 5, 2006 the Circuit Court for Baltimore City awarded custody of R.J. to Parents, and R.J. went to live with Parents in Pottstown, Pennsylvania. Admin. FOF ¶ 13.

During the summer of 2006, Michael Coleman contacted Defendant, Pottstown School District, to discuss whether it could meet R.J.'s educational needs. Admin. FOF ¶ 14. At that time, Michael Coleman provided Defendant with R.J.'s records from Baltimore and R.J. was enrolled in Pottstown High School for the 2006-2007 school year. Id.

Defendant convened a team to develop an interim IEP for R.J. in August of 2006. Admin. FOF ¶ 15. This IEP summarized R.J.'s educational history and needs based on R.J.'s educational and behavioral assessments from Baltimore, including his March 2006 IEP. Id. The IEP team noted that R.J. exhibited behaviors that impeded his learning or that of others and that R.J. was at-risk for emotional problems. Id. This interim IEP provided for R.J. to receive a baseline assessment from which goals would be derived. Id. It also stated that a FBA would be conducted if behavioral problems arose. Id. R.J. was placed in a combination of special education and regular education classes. Id. This IEP's program modifications and specially-designed instruction

included small class settings, Lindamood-Bell instruction, audio books, and dictation to a scribe. Id. An included transition outcome stated that R.J. would explore tech classes. Id. Parents received and approved the Notice of Recommended Educational Placement (NOREP) resulting from this interim IEP. Id. At this time, R.J.'s IEP team believed that no further evaluation of R.J. was necessary in order to develop an IEP. Admin. FOF ¶ 16.

R.J. remained enrolled in the Pottstown High School for the duration of the 2006-07 and 2007-08 school years and received a new IEP in October of 2006 and 2007. Admin. FOF ¶¶ 17, 30. Defendant and Plaintiffs were in regular communication about R.J.'s progress during this period. Admin. FOF ¶¶ 23-24, 38. R.J. ceased to attend Pottstown High School and was enrolled in a private center providing Lindamood-Bell instruction during the 2008-09 academic year. Admin. FOF ¶ 41. During the 2008-09 year the parties remained in communication, and in March of 2009 R.J.'s IEP team met to develop a program for R.J. Admin. FOF ¶ 42. R.J. did not return to the Pottstown School District after 2009. Admin. FOF ¶ 45.

B. Findings of Fact on Contested Issues

The parties do not dispute R.J.'s educational and behavioral record prior to enrolling in the Pottstown School District in the summer of 2006. Additionally, the parties are in agreement regarding the general timeline of events during the

12

2006-07, 2007-08, or 2008-09 school years. Therefore, the Court

will address the contested issues material to Plaintiffs'

allegations.

     1)    <u>One-on-One and Lindamood-Bell Style Instruction</u>

              <u>at Pottstown School District</u>

R.J.'s IEPs prepared in August and October of 2006 include

one-n-one instruction as part of R.J.'s reading skills program.[3]

R.J. received reading instruction from Judith Miller, a special

education reading teacher employed in Defendant School District.[4]

Ms. Miller completed training in the Lindamood-Bell

instructional method prior to 2006 and administered the method

to R.J. during the 2006-07 and 2007-08 academic years.[5]

Defendant's decision to deny funding for R.J. to attend a

private Lindamood-Bell placement was based in part on

Defendant's intention to continue R.J.'s Lindamood-Bell

instruction with Ms. Miller.[6] The record indicates that R.J.

received individualized or small class instruction with a

---

       [3] <u>See</u> Parents' Ex. 13, August 2006 Interim IEP at 2; Parent's Ex. 16, Oct. 2006 IEP at 5. During the administrative due process hearing preceding this case, R.J.'s parents and Defendant each submitted numerous numbered exhibits in order to develop the factual record. These submissions have not all been submitted on the record in this case, though they did form the basis of the administrative decision under review and furthermore are referred extensively in the parties' proposed findings of fact. Where the Court relies on these documents, the source of the documents, as either "Parents' Exhibit" or "Sch. Dist. Exhibit" will be identified.

       [4] <u>See</u> Test. of Judith Miller, Admin. Hr'gs Tr. 440, May 19. 2010. This testimony was taken as part of a five session administrative due process hearing occurring on March 15, May 18, May 19, August 16, and August 17, 2010. The transcript of these five hearings is numbered consecutively.

       [5] <u>See</u> <u>Id.</u> 345-350, 380, May 19, 2010.

       [6] <u>See</u> Pls.' Ex. J, Email from Rita Cohen to Judith Miller 1-2, Jan. 10, 2007, ECF. No. 30-6.

special education teacher in reading approximately every other day during the 2006-07 and 2007-08 academic years.[7]

### 2) Instruction, Accommodations, and Modifications in Pottstown School District IEPs

R.J.'s 2005 Neuropsychological Report recommended a number of specially-designed instructions ("SDIs") to enable R.J.'s access to educational materials.[8] R.J.'s October 2006 IEP included a number of these SDIs, such as "small classroom setting, cueing to remain on task," "extra time to complete tests," "repeated directions/directions read aloud," and "dictation to a scribe."[9] These SDIs were intended to be implemented primarily in a "learning support classroom," where R.J. was to receive 60% of his instruction.[10] In R.J.'s October 2007 IEP, SDIs from his prior IEP were retained and supplemented with additional instructions including "seating near area of instruction," "reduce[d] written quantity in classwork/tests," "reduce[d] number of tests and test items," and "use of a calculator."[11]

### 3) Transition Planning at Pottstown High School

---

[7] See Parents' Ex. 20, IEP Team Education Recommendation Form at 2, Mar. 22, 2007, ("[R.J.] receives 1:1 tutoring every other day for Lindamood-Bell."); see also Test. of Judith Miller, Admin. Hr'gs Tr., 440, May 19. 2010.
[8] See Sch. Dist. Ex. 2, Neuropsychological Evaluation 19-22, Nov. 16 and 29, 2005
[9] Oct. 2006 IEP at 12.
[10] Id. at 1, 5.
[11] Parents' Ex. 23, Oct. 2007 IEP at 10.

R.J.'s IEPs completed by Defendant in August and October of 2006 included transition services in the form of tech classes at Pottstown High School.[12] One block of R.J.'s course schedule was devoted to courses furthering this goal, including "Careers in Mech/Tech" and "Construction Tech."[13]

In R.J.'s October 2007 IEP, transition services were again recommended. These services included technology classes, participation on culinary volunteer opportunities, and participation in the Armed Forces Vocational Aptitude Battery ("AFVAB") during his senior year in furtherance of his interest in a career in the military.[14]

4)      Measurable Goals and Progress Monitoring in
             R.J.'s October 2006 and October 2007 IEPs

In the October 2006 IEP, R.J.'s recognized needs relating to his disability included reading fluency, written expression skills, math calculation, and math reasoning.[15] R.J.'s October 2006 IEP set measurable annual goals in reading fluency, math computation, and writing.[16] Though R.J. had documented needs in the areas of written expression, math reasoning, math

---

[12] See Parents' Ex. 13, Aug. 2006 Interim IEP at 9.
[13] Id. at 18; see Oct. 2006 IEP at 8; Sch. Dist. Ex. 28, Student Transcript, (showing R.J.'s enrollment in "Construction Tech." at Pottstown High School during the 2006-07 school year). These recommendations, as well as enrollment in culinary arts and screening for ASVAB (Armed Services Vocational Aptitude Battery) were continued in R.J.'s October 2007 IEP. See Oct. 2007 IEP at 16.
[14] See Oct. 2007 IEP at 12; Sch. Dist. Ex. 44, Student Schedule, 2007-2008 at 3
[15] See id. at 5.
[16] See Oct. 2006 IEP at 10-12.

calculation, reading comprehension, vocabulary, and decoding, the IEP did not set annual goals or conduct progress monitoring in these areas.[17]

In R.J.'s October 2007 IEP, his recognized needs remained the same as in 2006.[18] In 2007, R.J.'s IEP team set annual goals in both reading fluency and math computation, but the math computation goal listed in the IEP was left incomplete.[19] The record reflects periodic progress monitoring of reading fluency during the 2007-08 year in the form of reading probes.[20] Even though the 2007 IEP called for progress monitoring in math through the use of similar periodic probes, the record suggests that no such probes were conducted.[21]

     5)     <u>Pottstown School District's Response to Student's Behavioral Issues</u>

R.J. exhibited disruptive behavior on an ongoing basis during the 2006-07 school year.[22] Defendant designed a new IEP for R.J. in October of 2006. The IEP's behavioral plan included thirty minutes of counseling with a school psychologist each week, which R.J. did attend.[23]

---

[17] Test. of Dr. Nancy Bloomfield, PhD., Hr'g Tr. 36-37, Sept. 21, 2012, ECF No. 50.
[18] <u>See</u> Oct. 2007 IEP at 5.
[19] <u>See</u> Oct. 2007 IEP at 9.
[20] <u>See</u> Parents' Ex. 28, Timed Reading Probes and Progress Monitoring Data at 1-2.
[21] <u>See</u> Oct. 2007 IEP at 9.
[22] <u>See</u> Pls.' Ex. E, Sch. Dist. Behavioral Records at 1-6, ECF No. 30-4.
[23] <u>See</u> Admin. FOF ¶ 21; <u>see also</u> Oct. 2006 IEP; Test. of Dr. Steven Brooks, Admin. Hr'gs Tr. 491, 505, Aug. 16, 2010.

At the time that the District developed R.J.'s October 2006 IEP, members of the IEP team believed that the behavioral plan in the prior IEP was working, that R.J.'s social skills were improving, and that the weekly counseling sessions sufficiently addressed R.J.'s behavioral problems.[24]

While R.J.'s assigned school psychologist recognized that R.J. showed behavioral problems in the 2006-07 school year, the behavioral problems did not appear severe enough to warrant anything beyond counseling, particularly as R.J. was producing passing work.[25]

R.J.'s October 2006 IEP recognized that R.J. possessed "behaviors that impeded [his] learning or that of others," and that he was "at risk for emotional problems;" the IEP also stated that an FBA would be conducted "if behavioral issues [arose]."[26] The October 2006 IEP included a Behavioral Improvement Plan ("BIP") that addressed interactions with peers and adults, expression of frustration and anger, and self-esteem.[27]

No FBA was conducted on R.J. during the 2006-07 year. R.J.'s school psychologist, Dr. Brooks, indicated that the

---

[24] See Admin. FOF ¶ 21; see also Oct. 2006 IEP at 4; Test. of Judith Miller, Admin. Hr'gs Tr. 392-93, May 19, 2010.
[25] See Admin. FOF ¶ 21; Test. of Dr. Steven Brooks, Admin. Hr'gs Tr. 519, Aug. 16, 2010; see also Oct. 2006 IEP at 5 (showing R.J.'s interim grades in the fall of 2006 ranging from 79% to 95%).
[26] Oct. 2006 IEP at 4-5.
[27] See Admin. FOF ¶ 19; Oct. 2006 IEP at 12, 16.

District determined that no FBA was necessary at the time because R.J. did not present issues during his counseling sessions and the District believed that it had already determined the underlying reasons for R.J.'s misbehavior.[28] Additionally, Dr. Brooks indicated that because R.J.'s academic performance was adequate and because his behavior was not substantially affecting his attendance, an FBA was not required at that time.[29]

Defendant did not conduct an FBA in conjunction with designing a new IEP for R.J. in October of 2007.[30] During the 2007-08 academic year, R.J.'s behavior further declined.[31] Defendant documented many incidents of misbehavior by R.J. that appeared to compromise his learning process.[32]

---

[28] Test. of Dr. Steven J. Brooks, Hr'g Tr. 57-58, 69, 73, Sept. 21, 2012, ECF No. 50.

[29] Test. of Dr. Steven J. Brooks, Admin. Hr'gs Tr. 492-93, Aug. 16, 2010 (stating that an FBA would have been applied in the 2006-07 year if R.J.'s behavior had resulted in discipline, such as extended suspensions causing him to miss instruction); Id. 520 (stating that during the 2006-07 year "[R.J.] wasn't excelling, but that he was doing passing work").

[30] Test. of Dr. Steven J. Brooks, Hr'g Tr. 50, Sept. 21, 2012.

[31] See Admin. FOF ¶¶ 33- 34; Test. of Judith Miller, Admin. Hr'gs Tr. 434-35, May 19, 2010; see also Pls.' Ex. F, email from Judith Miller to Rita Cohen, Jan. 7, 2009, ECF No. 30-4 ("[R.J.] had many behavioral issues [while he attended Pottstown High School]."); Test. of Dr. Steven J. Brooks, Admin. Hr'gs Tr. 520, Aug. 16, 2010 (testifying that it reached his attention that R.J.'s behavior problems began to emerge during the school year); Oct. 2007 IEP at 5 ("[R.J.'s] behavior has changed dramatically since last year. He is often argumentative and talks excessively in class. He has also been swearing and using inappropriate language in class. Mike Coleman, [R.J.'s] guardian, has been working closely with the IEP team to keep a handle on [R.J.'s] behavior.").

[32] See Pls.' Ex. E, at 7-27, ECF 30-4 (various documents); Admin. FOF ¶¶ 33-34.

Dr. Brooks characterized R.J.'s misbehavior during the 2007-08 school year as "periodic" rather than "ongoing."[33] For this reason, and because Defendant believed that it knew the reason for the misbehavior (that R.J. was missing his family and home in Baltimore), conducting an FBA on R.J. during the 2007-08 academic year was deemed unnecessary.[34]

In response to R.J.'s behavioral and emotional issues during the academic year, Dr. Brooks referred R.J. to a Student Assistance Program ("SAP"). This program was intended to provide counseling or therapy services outside of the school setting. This course of action was recommended, in part, because R.J.'s behavior at the time appeared to be originating from circumstances (R.J.'s separation from his family in Baltimore) that were out of Defendant's control.[35]

6)    Academic Gains in Identified Areas of Concern, September 2006 through May 2008

During the 2006-07 school year, R.J. received passing grades[36] and was reportedly improving in the area of reading

---

[33] Test. of Dr. Steven J. Brooks, Admin. Hr'gs Tr. 520-21, Aug. 16, 2010.

[34] Id. 521, 525-27.

[35] Id. 525-29; see also Admin Decision at 12-13.

[36] See Oct. 2006 IEP at 5 (showing R.J.'s grades, as of October 9, 2011, as 92% (reading), 79% (science), 95% (computer foundations), and 85% (wellness); Sch. Dist. Ex. 17, Student Transcript (showing R.J.'s academic history as of June 20, 2007, showing final grades of 88% (Computer Foundations), 76% (Math), 79% (Science), 70% (Wellness), 88% (Wilson Reading), and 72% (Writing Skills)).

fluency and decoding.[37] In March of 2007, R.J. was "receiving education at a second grade level," meaning that the materials that he was working with were at the second grade level.[38] At this time, R.J. was receiving one-on-one instruction in the Lindamood-Bell style for reading in a special education context at Pottstown High School.[39]

In March of 2007, Michael Coleman, R.J.'s advocate and adoptive older brother, expressed concerns to Defendant that while R.J.'s grades remained in the passing range and his special education teacher indicated that his reading was improving, that R.J. was not actually making progress in reading.[40] On March 26, 2007, following a meeting of R.J.'s IEP team, R.J. received a speech/language screening which did not reveal a need for further speech/language evaluation.[41] While

---

[37] IEP Team Education Recommendation Form ¶1; see also Admin.. FOF ¶ 25.

[38] Test. of Rita Cohen, Admin. Hr'gs Tr. 212-17, May 18, 2010 (discussing preparation of the March 22,2007 IEP recommendation); see also IEP Team Education Recommendation Form at 2.

[39] See IEP Team Education Recommendation Form.

[40] Test. of Michael Coleman, Admin. Hr'gs Tr. 80-81 Mar. 15, 2010 (stating that during 2006-07 he was concerned that R.J. wasn't making progress, that Judith Miller would say that R.J. was making progress in reading fluency and that he brought home good grades, but that he didn't appear to be improving); see also IEP Team Recommendation Form ("Mike Coleman is concerned about [R.J.]'s growth in reading."). Judith Miller, R.J.'s special education teacher during the 2006-07 school year, explained in the Administrative Due Process Hearing on this matter that the apparent discrepancy between R.J.'s low assessment scores and higher letter grades was the result of his work in each academic class being adjusted to his current reading level. See Test. of Judith Miller, Admin. Hr'gs Tr. 342, May 19, 2010.

[41] Admin. FOF ¶ 26. A speech/language screening conducted for R.J. on March 26, 2007 did not reveal a need for further evaluation. See Test. of Rita Cohen, Admin. Hr'gs Tr. 265, May 18, 2010; Sch. Dist. Ex. 15, Speech/Language Screening, Mar. 26, 2007 , ("[R.J.]'s articulation skills

R.J.'s grades took a generally downward trend during his two years at Pottstown High School, they remained almost entirely in the passing range.[42]

A primary source of contention in this case is the degree to which R.J. improved in basic academic skills-reading, writing, and math-over the course of his academic career, as evaluated in standardized achievement tests. A practical hurdle in evaluating whether R.J. made "meaningful progress" during the period involved in this dispute is the inconsistent nature of R.J.'s evaluations, as his proficiency has been measured through a number of different testing methods and in different settings throughout the years. Because the results of these evaluations lie at the center of this case, they are reviewed here.

On November 16 and 29, 2005, R.J. received a neuropsychological evaluation at Mt. Washington Pediatric Hospital in Maryland.[43] This evaluation measured R.J.'s academic achievement levels under the Woodcock Johnson Tests of

---

were informally judged to be good in known and unknown contexts. Further speech/language evaluation is not recommended at this time.").

[42] R.J. finished the 2006-07 year with passing grades, including a 76% in Math, a 88% in Wilson Reading, and a 72% in Writing. See Sch. Dist. Ex. 28, Student Transcript at 1. R.J.'s Oct. 2007 IEP indicated his grades as of October 16, 2007 were passing (70% (reading), 72% (science), 82%(social studies), 84% (math), and 80% (economics)). Sch. Dist. Ex. 15, Oct. 2007 IEP at 5. At the conclusion of the 2007-08 school year, R.J.'s school transcript reflected final grades of 70% (computer applications), 78% (economics), 82% (English), 85% (Fundamentals of Math), 76% (Science), 75% (Social Studies), 79% (USA Today), 68% (Wellness), and 82% (Wilson Reading). Sch. Dist. Ex. 28, Student Transcript; see also Sch. Dist. Ex. 28, Pottstown High Sch. Grading Scale, (showing a passing grade of "D" corresponding to a numeric grade of "70").

[43] See Neuropsychological Evaluation, Nov. 16 and 29, 2005.

Achievement, Third Edition, Form B, and indicated reading
ability at a 2.0 grade equivalent, reading fluency at a 1.9
grade equivalent, mathematical calculation at a 3.5 grade
equivalent, math fluency at a 3.6 grade equivalent, and writing
fluency at a 2.3 grade equivalent.[44] A review of R.J.'s
performance during this evaluation indicated that R.J. "remained
at a 1st to 2nd grade level for all areas of reading, between a
2nd and 3.6 grade level for all areas of math, and between a 1st
and 2.3 grade level for written expression," "despite intensive
intervention and tutoring."[45] During this evaluation, it was
noted that R.J.'s scores indicated a "chronic lack of
achievement in spite of intensive formal education and []
tutoring outside the academic setting" suggesting that R.J.'s
specific learning disabilities required a "more intensive
approach."[46]

On March 2, 2006, R.J.'s IEP Team in Baltimore met to
design a new IEP. According to R.J.'s IEP Team Evaluation
report, as of that date R.J. appeared to possess reading skills
and reading comprehension at between a first and second grade
level, math skills close to or at a third grade level, writing
skills at approximately a second grade level, and spelling at a

---

[44] See id. 13.
[45] Id. 30.
[46] Id. 17.

first to second grade level.[47] In R.J.'s draft IEP prepared on that same date, however, he was recorded as possessing reading comprehension and sight word recognition at a third grade level, math computation skills at a fourth grade level, word problem solving skills at/near a second grade level, spelling at a second grade level, and written expression skills at a third grade level.[48]

On May 8, 2008, Pottstown High School evaluated R.J.'s literacy skills using the Woodcock-Johnson III Tests of Achievement. In this evaluation, R.J.'s achievement level varied by subsection; his Letter-Word Identification, Passage Comprehension, and Writing Samples scores all fell in the kindergarten to first grade range, while his applied problems and word attack scores reached a fourth grade level.[49]

On or around May 13, 2008, R.J.'s academic skills were also measured in a battery of evaluations by the Lindamood-Bell program in Bryn Mawr, Pennsylvania. During these evaluations, R.J. scored at a 1.8 grade level on a test of Woodcock NU Word attack, a 3.1 grade level on the Slosson Oral Reading Test, and a 3.5 grade level on the Gray Oral Reading Test.[50]

---

[47] Sch. Dis. Ex. 3, IEP Team Meeting Evaluation Report at 2, Mar. 2, 2006, (scores based on Brigance 02/06 and KTREA 11/05, and Mann-Suiter testing methods).
[48] Parents' Ex. 3, Baltimore City Public School System Draft IEP for R.J. at 1. These tests were based on Brigance (02/06)<?> testing methods.
[49] Score Report, Parents' Ex. 26, at 2.
[50] Lindamood-Bell Testing Summery for [R.J.], Parents' Ex. 30, at 1-2 (relying on R.J.'s pre-test scores dated May 13, 2008).

R.J.'s progress in reading fluency, one of his identified areas of need in his 2006 and 2007 IEPs, was tracked by the District with periodic progress monitoring in the form of one minute reading probes.[51] These word probes collectively indicate an improvement from a 1.5 reading level to a 2.0 or 3.0 reading level during the 2006-07 year.[52] During this period R.J. increased from a baseline word count per minute (WCPM) score of 64 (collected August 29, 2006) to an average of 101.5 (collected May 14, 2006), indicating an increase of 37.5 words per minute for the year.[53] In R.J.'s second year, overall improvement slowed, though the data indicates that he did manage to maintain scores in the 3.0 grade range that he had only started to achieve at the end of the 2006-07 year. In the 2007-08 year R.J.'s baseline score of 95 WCPM (collected September 14, 2007) improved to an average of 105 WCPM (collected May 16, 2008), indicating an increase of only 10 words per minute for the year.[54] Assuming an academic year lasting a minimum of 30 weeks, this data indicates that R.J. had weekly gains of 1.25 words per minute during the 2006-07 year, and .33 words per minute in the 2007-08 year.

---

[51] See Timed Reading Probes and Progress Monitoring Data at 1-2.
[52] Id.
[53] Id.
[54] Id.

III. STATEMENT OF APPLICABLE LAW

A. Standard of Review of Hearing Officer's Decision and Burden of Proof

1. When considering a challenge to an administrative decision on an IDEA claim, a district court may exercise a "modified de novo" standard of review. S.H. v. State-Operated Sch. Dist. of the City of Newark, 336 F.3d 260, 270 (3d Cir. 2003); see also L.E. v. Ramsey Bd. Of Educ., 435 F.3d 384, 389 (3d Cir. 2006); Ridley Sch. Dist. v. M.R., 680 F.3d 260, 268 (3d Cir. 2012). This means that the district court "may reach an independent decision, except that it must accord the decision of the [special education hearing officer] 'due weight' in its consideration." Carlisle Area Sch. Dist. v. Scott P., 62 F.3d 520, 524 (3d Cir. 1995), cert. denied., 517 U.S. 1135 (1996).

2. "Due weight," under the modified de novo review standard implies that "[f]actual findings from the administrative record are to be considered prima facie correct." S.H., 336 F.3d at 270. This standard applies to challenges to a student's IEP under IDEA, but courts in the Third Circuit have not held affirmatively that this same standard should apply

to challenges under Section 504 of the
Rehabilitation Act. See Centennial Sch. Dist. v.
Phil L. ex rel. Matthew L., 799 F. Supp. 2d 473, 482
(E.D. Pa. 2011) (Robreno, J.) (citing Borough of
Palmyra, Bd. of Educ. v. F.C., 2 F. Supp. 2d 637,
640 n. 3 (D.N.J. 1998)).

3. If a district court chooses to depart from the
administrative findings of a special education
hearing officer, it must provide some explanation
for that departure. See id. (citing S.H., 336 F.3d
at 270).

4. Where a district court receives new evidence beyond
what was presented in the administrative proceeding,
it is "free to accept or reject the agency findings
depending on whether those findings are supported by
the new, expanded record and whether they are
consistent with the requirements of the Act." L.R.
v. Manheim Twp. Sch. Dist., 540 F. Supp. 2d 603,
614-15 (E.D. Pa. 2008) (quoting S.H., 336 F.3d at
270); see also Oberti v. Bd. of Educ. of the Borough
of the Clementon Sch. Dist., 995 F.2d 1204, 1220 (3d
Cir. 1993); Antoine M., 420 F. Supp. 2d at 401-02.

5. The "District Court must accept the state agency's
credibility determinations 'unless the non-

testimonial extrinsic evidence in the record would <u>justify</u> a contrary conclusion.'" <u>Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.,</u> 381 F.3d 194, 199 (3d Cir. 2004) (emphasis in original) (quoting <u>Scott P.,</u> 62 F.3d at 529).

6. The party challenging the appropriateness of a student's IEP bears the burden of proof in both administrative proceedings and proceedings before the District Court. <u>L.E.</u> 425 F.3d at 392; <u>see also Schaffer ex rel. Schaffer v. Weast,</u> 546 U.S. 49, 62 (2005).

7. To the extent that parties challenge the appropriateness of an IEP using experts who perform a review of educational records, courts have cast doubt upon the relative weight of these experts relative to school employees who actually worked with a student. <u>See, e.g.,</u> <u>Krista P. v. Manhattan Sch. Dist.,</u> 255 F. Supp. 2d 873, 887 (N.D. Ill. 2003).

B. <u>FAPE Standard under the IDEA</u>

8. Central to Plaintiffs' claims is the issue of whether the District provided R.J. with a FAPE as intended under the IDEA. <u>See</u> <u>K.C. ex rel. Her Parents v. Nazareth Area Sch. Dist.,</u> 806 F. Supp. 2d

27

806, 813 (E.D. Pa. 2011) (Robreno, J.) (citing 20

U.S.C. § 1400 (d)(1)(A)). "A FAPE is 'an educational

instruction 'specially designed . . . to meet the

unique needs of a child with a disability,' coupled

with any additional 'related services' that are

required to assist a child with a disability to

benefit from [that instruction].'" Id. (citing

Winkelman ex rel. Winkelman v. Parma City Sch.

Dist., 550 U.S. 516 (2007) (citing 20 U.S.C. §

1401(29))); see also M.R., 680 F.3d at 268.

9. The FAPE promised to students in the IDEA is not a

perfect or ideal education. The Congressional

purpose of the IDEA was to "open the door of public

education to handicapped children on appropriate

terms" more than it was intended to "guarantee any

particular level of education once inside." Br. Of

Educ. of Hendrick Cent. Sch. Dist., Westchester

Cnty. v. Rowley, 458 U.S. 176, 192 (1982); see also

K.C., 806 F. Supp. 2d at 813 (explaining that a FAPE

is not a guarantee of the "best possible" or maximal

education); Scott P., 62 F.3d at 534 (defining the

duty of schools under the IDEA as to provide a

"floor of opportunity," not to provide "optimal"

levels of service).

10.  To satisfy its duty to provide a qualifying
     student with a FAPE, a school district must develop
     an Individualized Educational Plan (IEP)[55] that
     responds to the student's identified educational
     needs by identifying the student's present
     abilities, goals for improvement, services designed
     to meet those goals, and a timetable for reaching
     those goals. K.C., 806 F. Supp. 2d at 813 (citing
     D.S., 602 F.3d at 557); see also 20 U.S.C. §§
     1412(a)(4), 1414(d)(1)(A)(i); Holmes v. Millcreek
     Twp. Sch. Dist., 205 F.3d 583, 589 (3d Cir. 2000).

11.  To adequately provide an appropriate education
     under the IDEA, an IEP must be "reasonably
     calculated to enable the child to receive
     educational benefits." K.C., 806 F. Supp. 2d at 813
     (quoting Rowley, 458 U.S. at 207 (stating FAPE was
     "sufficient to confer some [] benefit")). An IDEA-
     compliant IEP will provide "significant learning"
     and confer a "meaningful benefit." Id. (quoting
     Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172

---

[55] The group of individuals responsible for designing an IEP (the "IEP team") must include a student's parent, special and regular education teachers of the student (where appropriate), a representative of the school district with knowledge of the district's general and special educational curriculum and resources, and, upon request, a person with specialized knowledge or expertise regarding the student. See 20 U.S.C. § 1414 (d)(1)(B); D.S., 602 F.3d at 557. The IEP team will review the IEP at least annually to determine whether the stated goals for the student are being achieved. See 20 U.S.C. § 1414 (d)(4); D.S., 602 F.3d at 557.

F.3d 238, 247 (3d Cir. 1999)). This measure of sufficient educational benefit has alternatively been defined as more than trivial, implying more than just "access to the school house door." Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 180 (3d Cir. 1988), cert. denied, 488 U.S. 1030 (1989).

12.  Though maximal or optimal educational services or results are not guaranteed under the IDEA, a school district must, in designing an IEP, identify goals for meaningful improvement relating to a student's potential. P.P. ex rel. Michael P. v. West Chester Area Sch. Dist., 585 F.3d 727, 729-30 (3d Cir. 2009).

13.  While an IEP must be developed in consideration of a student's potential and with an eye to long-term goals, evaluations of the adequacy of an IEP can only be determined "as of the time it was offered to the student, and not at some later date." Furhman v. East Hanover Bd. of Educ., 993 F.2d 1031, 1040 (3d Cir. 1993) (citing Rowley, 458 U.S. at 206-07); see also J.P. ex rel. Popson v. West Clark Cmty Schs., 230 F. Supp. 2d 910, 919 (S.D. Ind. 2002).

C. <u>Procedural Violations of the IDEA and Challenging the</u>
   <u>Substantive Contents of an IEP</u>

14.  Students and parents may raise a cause of action
against a school district for procedural violations
of the IDEA.  A purely procedural violation of the
IDEA, however, can only justify prospective
injunctive relief to ensure future compliance with
IDEA procedures, not compensatory relief or tuition
reimbursement. See <u>C.H. v. Cape Henlopen Sch. Dist.,</u>
606 F.3d 59, 66 (3d Cir. 2010).

15.  A procedural violation may rise to a substantive
violation justifying compensatory education or
tuition reimbursement, but only where plaintiffs can
show that procedural defects caused such substantial
harm that a FAPE was denied. <u>Id.</u> at 66-67. To prove
such substantive harm, plaintiffs must prove by a
preponderance of the evidence that "procedural
inadequacies (i) [i]mpeded the child's right to a
FAPE, (ii) significantly impeded the parent's
opportunity to participate in the decision-making
process regarding the provision of a FAPE to the
parent's child; or (iii) caused a deprivation of the
educational benefit." <u>See</u> <u>id.</u> (quoting 34 C.F.R. §
300.513 (a)(2)); <u>see also</u> <u>Rodrigues v. Fort Lee Bd.</u>

of Edu., 458 Fed. Appx. 124, 127 (3d Cir. 2011)
(not precedential) (finding that a lack of
measurable goals in an IEP was a procedural error
but did not affect a student's substantive rights or
deny a FAPE where student was mainstreamed and
progress was measured by grades and state
proficiency assessments); N.M. ex rel. M.M. v. Sch.
Dist. of Philadelphia, 394 Fed. Appx. 920, 923 (3d
Cir. 2010) (not precedential) (finding that IEP
lacking annual goals relating to some of a student's
needs stemming from his disability was not a
procedural flaw rising to a substantive harm because
the IEP still provided a FAPE).

16.  Courts in the Third Circuit have, in the past,
condensed apparent procedural violations—like
failing to include particular provisions in a
disabled student's IEP, and thus allegedly failing
to program for the student's recognized educational
needs—into a substantive question of whether a
student was offered meaningful educational benefit
in the form of a FAPE. See D.S., 602 F.3d at 565
(stating that "the content of an IEP . . . does not
implicate the IDEA's procedural requirements" and
that disputes about the content of an IEP are

"concerned with the IEP's substance, i.e., whether

the IEP [is] 'reasonably calculated to enable the

child to receive educational benefits.'" (citing

<u>Rowley</u>, 458 U.S. at 207)).

D. <u>New Testing Requirements for In-Transferring Students</u>

   <u>with Existing IEPs</u>

   17.  The federal regulations implementing the IDEA

        identify a school district's specific obligations to

        a student with an existing IEP who transfers from

        another state. Under this regulation, the new school

        district must provide a FAPE that include comparable

        services to those described in the student's prior

        IEP until the district conducts an evaluation

        pursuant to 34 C.F.R. §§ 300.304–300.306 (if the

        district determines such an evaluation necessary),

        and develops, adopts, and implements a new IEP, if

        appropriate, that meets applicable requirements. <u>See</u>

        34 C.F.R. § 300.323.

E. <u>Monitoring Requirements under the IDEA</u>

   18.  At least one District Court has upheld a hearing

        officer's finding that a FAPE was provided to a

        student with learning disabilities in spite of sub-

        par progress monitoring of IEP goals. In <u>I.H. ex</u>

        <u>rel. D.S. v. Cumberland Valley Sch. Dist.</u>, 2012 WL

2979038 (M.D. Pa., July 20, 2012), the Middle
District of Pennsylvania upheld a hearing officer's
denial of an IDEA claim where progress monitoring
"left much to be desired," noting that the IDEA does
not require "optimal" progress monitoring. Id. at
10, 11.

F. <u>Treatment of Behavioral Issues under the IDEA</u>

19.  In designing an IEP for a student whose
educational progress may be impeded by behavioral
issues, school districts must "consider the use of
positive behavioral interventions and supports, and
other strategies, to address that behavior." 34
C.F.R. § 300.324 (a)(2)(i).

20.  While an FBA may be appropriate as a matter of
good practice in some instances where a student
shows behavioral problems, "the IDEA only requires
such analysis where a [student] has been identified
with a disability and has an IEP in place, yet still
displays behavioral problems." <u>D.K v. Abington Sch.
Dist.</u>, 2010 WL 1223596, at *9 (E.D. Pa., Mar. 25,
2010), <u>aff'd</u> 696 F.3d 233 (3d Cir. 2012) (finding
that a school district did not violate the IDEA when
a student showed problematic behavior where the
district "responded proactively" to the student's

behavioral problems, where the student continued to make substantial progress, and where he was not previously identified as a special needs student).

21. The IDEA has also been held to impose an affirmative requirement to conduct an FBA, though that obligation only arises in situations where a "disabled student is subjected to certain types of discipline." Alex R. ex rel. Beth R. v. Forrestville Valley Cmty Unit Sch. Dist., 375 F.3d 603, 614 (7th Cir. 2004) (citing 20 U.S.C. § 1415(k)(1)); see also Sch. Bd. of the City of Norfolk v. Brown, 769 F. Supp. 2d 928, 943 (E.D. Va. 2010) (suggesting that a school district failed its IDEA obligations when it failed to conduct an FBA for a student who experienced several behavioral incidents, including a suspension).

22. Creating an adequate IEP under the IDEA requires that a school district consider "positive behavioral interventions" under 20 U.S.C. § 1414 (d)(3)(B)(i) where a student's behavior impedes his learning; however, other courts have interpreted that this requirement does not require an FBA, at least not where "the IEP sets forth other means to address the student's problematic behaviors." M.H. v. New York

City Dept. of Educ., 712 F. Supp. 2d 125, 158
(S.D.N.Y. 2010); see also A.C. ex rel. M.C. v. Bd.
of Educ. of the Chappaqua Central Sch. Dist., 553
F.3d 165, 172 (2d Cir. 2009) (finding an IEP lacking
an FBA adequate where other behavior management
strategies were included). The Second Circuit noted
that "the sufficiency of [chosen] strategies for
dealing with [problematic] behavior 'is precisely
the type of issue upon which the IDEA requires
deference to the expertise of the administrative
officers.'" (citing Grim v. Rhinebeck Cent. Sch.
Dist., 346 F.3d 377, 382 (2d Cir. 2003)).

G. Transitional Services Requirements under the IDEA

23.  In the past, the Third Circuit has noted that the
IDEA was created, in part, to allow students with
disabilities to ultimately live independent and
productive lives. See Ferren C. v. Sch. Dist. of
Philadelphia, 612 F.3d 712, 717 (3d Cir. 2010)
(quoting 20 U.S.C. § 1400(d)(1)(A)). Thus, a
satisfactory IEP, for a student that is sixteen
years[56] or older, must also identify transitional
needs and services. See 20 U.S.C. § 1414
(d)(1)(A)(i)(VIII)  Transition services are to be

---

[56] In Pennsylvania, however, transition planning should begin at the age
of fourteen as per state law. See 22 Pa. Code § 14.131(a)(5).

designed "within a results-oriented process . . . focused on improving the academic and functional achievement of the [student] to facilitate . . . movement . . . to post-school activities [including] independent living . . . ." 34 C.F.R. § 300.43; see also id. § 300.321.

24. The Third Circuit has not defined what amount of transition planning is required in an IEP to ensure a FAPE. See High v. Exeter Twp. Sch. Dist., 2010 WL 363832, at *6 (Feb. 1, 2010, E.D. Pa.). Several courts, including those in the Eastern District of Pennsylvania, have suggested that inadequate transition planning is a procedural defect and thus should be evaluated based on whether substantial harm has resulted. See, e.g., Sinan L. v. Sch. Dist. of Philadelphia, 2007 WL 1933021, at *8 (E.D. Pa., July 2, 2007), aff'd 293 Fed. Appx. 912 (3d Cir. 2008) (non-precedential); K.C., 806 F. Supp. 2d at 822 ("[T]ransition services should be evaluated under the FAPE standard."). The floor set by the IDEA for adequate transition services appears to be low, focusing on whether opportunities are created for a disabled student to pursue independent living

and a career, not just a promise of a particular
result. Id. at 822.

## H. Extended School Year (ESY) Services Requirements under the IDEA

25.  "[Extended School Year ("ESY")] services are only
necessary to a FAPE when the benefits a disabled
child gains during a regular school year will be
significantly jeopardized if he is not provided with
an educational program during the summer months."
M.M. ex rel. D.M. v. Sch. Dist. of Greenville Cnty.,
303 F.3d 523, 537-38 (4th Cir. 2002); see also
Johnson v. Dist. of Columbia, 873 F. Supp. 2d 382,
386 (D.D.C. 2012). The type of jeopardy necessary to
require ESY services is not merely a risk of
regression, as this is a risk that is experienced by
all students. See M.M., 303 F.3d at 538. Instead,
ESY services are only required to assure a FAPE
where such regression will substantially thwart the
goal of "meaningful progress." Id. (citing Polk, 853
F.2d at 184).

## I. Compensatory Education

26.  Where a district court finds that a school
district failed to provide a FAPE as required under
the IDEA, the court may award compensatory relief to

the plaintiff student in the form of appropriate educational services within the district, sometimes referred to as "compensatory education." C.H., 606 F.3d at 60 (citing Mary T. v. Sch. Dist. of Philadelphia, 575 F.3d 235, 249 (3d Cir. 2009)).

27. Compensatory education is not an appropriate remedy where a plaintiff raises only procedural violations to the IDEA; in such instances, only injunctive relief for prospective compliance may be awarded. Id. at 66.

28. Compensatory education is a judicially-created remedy not defined within the IDEA. See K.C., 806 F. Supp. 2d at 814 (citing Ferren C., 612 F.3d at 717). The Supreme Court has interpreted the IDEA to grant federal courts the power to apply equitable considerations in awarding this remedy. See Florence Cnty Sch. Dist. Four v. Carter, 510 U.S. 7, 7 (1993); Sch. Comm. Of Town of Burlington, Mass. v. Dept. of Educ. of Mass., 471 U.S. 359, 374 (1985).

29. Compensatory education is awarded to account for the period of time that a plaintiff student was deprived of his right to a FAPE. See Mary T., 575 F.3d at 249. This remedy accrues from the point that the school district knew or should have known that

an IEP failed to confer a greater than de minimis educational benefit to the student. Id. Thus, the calculation for compensatory relief should be for a period equal to the period of deprivation, less the time reasonably required for the school district to rectify the problem. Id.

J. Tuition Reimbursement Standard

30. A court may award a disabled student the cost of placement in a private educational program if the court concludes that (1) the public placement violated the IDEA by providing an inappropriate IEP, and (2) the student demonstrates that the private placement was proper under the IDEA. See N.E., 172 F.3d at 248; see also 20 U.S.C. § 1412(a)(10)(C)(ii) (stating that a court may require a school district to reimburse for the cost of enrolling a student with disabilities in a private placement if the school district did not make a FAPE available "in a timely manner prior to enrollment [in the private placement]"); Carter, 510 U.S. at 15.

31. Federal courts, in evaluating eligibility for reimbursement of private placement expenses, have broad discretion. See Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 246-47 (2009); Carter, 510 U.S.

at 15 (citing Sch. Comm. Of Town of Burlington,
Mass., 471 U.S. at 70). Reimbursement may be denied
or reduced based upon equitable considerations. See
20 U.S.C. § 1412(a)(10)(C)(iii); T.A., 557 U.S. at
246-47; Sch. Comm. Of Town of Burlington, Mass., 471
U.S. at 374.

32.  It is well-recognized that the IDEA does not
guarantee reimbursement for private placement to
parents who unilaterally move their child to a
private placement after disagreeing with the IEP
offered by a public school. Such a unilateral move
is taken "at [the parents'] own financial risk," and
reimbursement will only be issued by an order of the
court upon finding that the school district failed
to offer a FAPE and that the private placement was
proper. T.A., 557 U.S. at 247 (citing Carter, 510
U.S. at 15). Courts have emphasized, however, that
retroactive reimbursement—where a court finds that a
FAPE was not provided and a private placement
proper—is available to vindicate the full rights of
students and parents intended under the statute. See
Carter, 510 U.S. at 12 (citing Sch. Comm. Of Town of
Burlington, Mass., 471 U.S. at 370).

33. To be eligible for tuition reimbursement, parents must establish not only that the school district failed to provide a FAPE, but also that the private placement was appropriate. See, e.g., Mary T., 575 F.3d at 243.

34. Within the Third Circuit, a private placement has been deemed appropriate if it "provides significant learning and confers meaningful benefit," Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 276 (3d Cir. 2007), regardless of whether the placement provides an IEP or complies with other state educational standards, see Mary T, 575 F.3d at 242 (citing Carter, 510 U.S. at 14-15). In Mary T., the Third Circuit suggested this standard to mean that reimbursement may be available for a private placement that deviates from a traditional educational curriculum so long as the program is based on academic instruction and not medical treatment. 575 F.3d at 245.

35. If a private placement represents a more "restrictive" educational environment—one that does not maximize integration of disabled and nondisabled children, as required of public institutions under the IDEA—this does not render the placement

"inappropriate" for reimbursement purposes. <u>Warren</u>
<u>G. ex rel. Tom G. v. Cumberland Cnty. Sch. Dist.</u>,
190 F.3d 80, 83-84 (3d Cir. 1999).

36.   Private placements are not subject to the same
statutory standard for providing a FAPE as are
public school agencies. <u>See</u> <u>Carter</u>, 510 U.S. at 12-
13 (stating that the statutory definition of a FAPE
under 20 U.S.C. §1401 (a)(18) should not be applied
to private parental placements); <u>West-Windsor-</u>
<u>Plainsboro Reg'l Sch. Dist. Bd. of Educ. v. M.F. ex</u>
<u>rel. A.F.</u>, 2011 WL 835609, at *12 (D.N.J., Mar. 4,
2011) ("[T]he standard a [private] placement must
meet in order to be 'proper' is less strict than the
standard used to evaluate whether a school
district's IEP and placement are appropriate.").

K. <u>Statutory Framework of Plaintiffs' Claims under Section</u>
<u>504 of the Rehabilitation Act and the Americans with</u>
<u>Disabilities Act</u>

37.   Section 504 of the Rehabilitation Act provides
that "[n]o otherwise qualified individual with a
disability . . . shall, solely by reason of her or
his disability, be excluded from the participation
in, be denied the benefits of, or be subjected to
discrimination' under any program that receives

43

federal funds." 29 U.S.C. § 794(a). The Third
Circuit has equated § 504's "negative prohibition"
with the IDEA's "affirmative duty" to provide a FAPE
to qualified handicapped individuals. See D.K., 696
F.3d at 253 n.8 (citing M.R., 680 F.3d at 280).
Consequently, finding that a school district did not
deny a student a FAPE for purposes of the IDEA is
equally dispositive of a § 504 claim. Id.; see also
Phil L., 799 F. Supp. 2d at 481 (noting that § 504
and IDEA impose similar substantive requirements,
including providing a FAPE).

38. To prevail in a § 504 claim, in addition to
   proving that the school district has failed to
   provide a FAPE, a plaintiff must prove four
   elements: "(1) he is 'disabled' as defined by the
   [Rehabilitation] Act; (2) he is 'otherwise
   qualified' to participate in school activities; (3)
   the school or the board of education receives
   federal financial assistance; and (4) he was
   excluded from participation in, denied the benefits
   of, or subject to discrimination at, the school."
   Phil L., 799 F. Supp. 2d at 481 (citing N.E., 172
   F.3d at 253). Additionally, the plaintiff must
   demonstrate that the school district knew or should

have reasonably known of the plaintiff's disability. Id.

39.   Proving Plaintiffs' Americans with Disabilities Act ("ADA") claim requires the same substantive elements as a § 504 claim except that, under the ADA, Plaintiffs do not need to prove that Defendant received federal funding. See Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia, 587 F.3d 176, 189 (3d Cir. 2009) (citing McDonald v. Commonwealth of Pennsylvania, Dept. of Pub. Welfare, Polk Ctr., 62 F.3d 92, 95 (3d Cir. 1995)).

IV.   STATUTE OF LIMITATIONS: A THRESHOLD ISSUE

As noted above, Defendant has previously argued that IDEA's statute of limitations bars Plaintiffs from seeking any relief for IDEA violations that occurred prior to May 12, 2007 and thus that no relief may be granted for any alleged deficiencies that occurring during the 2006-07 academic year. See 20 U.S.C. § 1415 (f)(3)(C) (stating that an IDEA due process hearing must be requested "within 2 years of the date that [the requesting party] knew or should have known about the alleged action that forms the basis of the complaint"). Plaintiffs concede that the statute of limitations is implicated but assert that an exception applies where a school district makes "specific [m]isrepresentations . . . that it had resolved the problem

forming the basis of the complaint." Id. § 1415(f)(3)(D)(i). At
the administrative hearings, the Hearing Officer noted that case
law in the Third Circuit was unsettled as to whether a
misrepresentation must be intentional and knowing or might be
merely negligent in order for the exception to apply, and thus
applied the exception here. See Hearing Officer's Mem. on School
District's Mot. to Limit the Relevant Time Period, April 13,
2010 ("I conclude that a misrepresentation need not be
intentional for purposes of this exception to the IDEA statute
of limitations.").

As Defendant notes, in the time since the Hearing Officer
made this legal determination in 2010, the Third Circuit has
conclusively held that the § 1415 (f)(3)(D)(i) exception
requires plaintiff to prove that a misrepresentation by
defendant was "knowing" or "intentional" and that mere
negligence is insufficient. D.K., 696 F.3d at 246. The Court
thus finds that because the statute of limitations exception
requires a showing of knowing or intentional misrepresentation,
the Hearing Officer's determination regarding entitlement to an
exception based on negligent misrepresentation was incorrect.
Because Plaintiffs have not provided evidence of intentional or
knowing misrepresentation by the District, they are barred under
the IDEA statute of limitations from seeking relief for
violations that occurred more than two years prior to the date

of their first administrative filing on May 12, 2009.[57] Thus,
Plaintiffs' claims for relief for events occurring prior to May
2007 are barred by the statute of limitations.

Although Plaintiffs are foreclosed from relief for most of
the 2006-2007 school year, the events of the barred period are
considered below, alongside with later events, for background
and context because Plaintiffs assert that Defendant's IDEA
failings spanned the duration of R.J.'s time in the District..

V.    ANALYSIS AND CONCLUSIONS OF LAW ON PLAINTIFFS' SPECIFIC
      DENIAL OF FAPE CLAIMS

The Court will now evaluate each of Plaintiffs' specific
FAPE claims, as raised in their Proposed Findings of Fact and
Conclusions of Law, in light of the factual and legal record
developed in the case.

    A. Reevaluation Upon Enrollment in Pottstown School
       District

---

[57] Plaintiffs attempt to broaden the misrepresentation exception as
defined by D.K. by suggesting that an exception may be available if
Defendants made "egregious misstatements" and/or were "willfully indifferent
to the truth regarding their statements [about R.J.'s progress.]" Pls.'
Proposed Findings ¶ 340. The Court is unconvinced that this suggested
standard, which would again expand the statutory exception beyond the realm
of "knowing" misstatements, is consistent with the clear definition provided
the Third Circuit. Moreover, even provided that "deliberate indifference"
satisfied the statutory requirements, the Plaintiffs have not provided
evidence either to the Court or to the Administrative Hearing Officer that
any false or inaccurate statements made by Defendant arose to more than mere
negligence.

In preparing R.J.'s Interim IEP in August of 2006, the
Pottstown District did not conduct further evaluations of R.J.'s
academic capabilities or behavioral status.

In her Decision, Hearing Officer Skidmore rightly
determined that Defendant's failure to conduct new evaluations
of R.J.'s behavioral or academic status upon enrollment in the
summer of 2006 did not cause R.J. to be denied a FAPE or
constitute a procedural violation of the IDEA. See Admin.
Decision at 10. The District complied with federal regulations
in relying on the 2005 evaluations from Baltimore in creating a
new IEP for a transferring student with a prior IEP in place.
See 34 C.F.R. § 300.323(f).

   B.  No denial of FAPE based on provision of part-time
       learning support rather than full-time learning
       support or private placement

Plaintiffs assert that R.J. was denied a FAPE because
Defendant offered R.J. only part-time learning support rather
than either a placement in a private school or full time
learning support. See Pls.' Proposed Findings ¶ 280. While it is
possible that placement in a private school or more intensive
learning support than what was provided by the Defendant may
have resulted in an improved educational experience for R.J.,
Plaintiff's assertion overlooks the now generally recognized
principle that a FAPE does not require a school district to

48

provide a maximally beneficial education. Rowley, 458 U.S. at
192; Scott P., 62 F.3d at 533-34; K.C., 806 F. Supp. 2d at 813.
Instead, Defendant was obligated to provide R.J. with an
educational program reasonably calculated to provide some
educational benefit. Rowley, 458 U.S. at 200; K.C., 806 F. Supp.
2d at 813.

Based on the submissions provided in this case, the Court
cannot find evidence supporting the proposition that Defendant's
educational program was not reasonably calculated to provide an
educational benefit. Testing whether school district's
educational program was adequate, for FAPE purposes, should not
be a retrospective evaluation of the educational outcomes
achieved. See Furhman, 993 F.2d at 1040. It is significant that
R.J.'s achievement tests taken at Pottstown showed signs of
improvement. The fact that R.J. might have been able to achieve
greater results in a private program is not relevant to whether
Pottstown afforded R.J. an opportunity for meaningful progress.
While R.J.'s program was not optimal, the Court is unconvinced
that this program was defective under the IDEA.

C. No denial of FAPE based on lack of "consistent one-on-
   one instruction"

Plaintiffs raise a related challenge that R.J. was denied a
FAPE because Defendant failed to provide R.J. with "consistent
one-on-one instruction." Pls.' Proposed Findings ¶ 281.  The

record indicates, however, that during the 2006-07 and 2007-08 academic years, R.J. regularly received small class and individualized one-on-one instruction with a specialized education teacher. See supra note 7. This accommodation, while perhaps not optimal, satisfied Defendant's obligation under the IDEA because the accommodation was reasonably calculated to provide some educational benefit. As a result, the Court concludes that Defendant did not deny R.J. a FAPE due to the amount of individualized instruction provided to him.

> D. No denial of FAPE for failure to address ongoing behavioral issues

Plaintiffs assert that Defendant District denied R.J. a FAPE by failing to address R.J.'s ongoing behavioral issues, particularly by failing to set "quantifiable or measurable goals," to provide "more intensive counseling," or conduct an FBA. Pls.' Proposed Findings ¶¶ 282-84. As noted above, a school district must take into account problematic behaviors when developing an IEP, including conducting a FBA in certain instances. The case law does not support a finding that Defendant failed to meet its statutory obligations because the Defendant District took proactive steps to address R.J.'s behavior, and his behavior did not arise to a level triggering disciplinary measures that impeded his attendance. See Alex R., 375 F.3d at 614 ("[A] duty arises to conduct a[n] [FBA], and

then implement a behavioral intervention plan, when the school imposes certain disciplinary sanctions on a disabled child." (internal quotations omitted)).

The present case is distinguishable from Lauren P. ex rel. David and Annamarie P. v. Wissahickon Sch. Dist., 310 Fed App'x 552 (3d Cir. 2009) (non-precedential), where the Third Circuit upheld an administrative finding that a FAPE was denied to a student diagnosed with Attention Deficit Hyperactivity Disorder and other disabilities because of the school district's "failure to address [the student's] behavioral problems in a systemic and consistent way." Id. at 554-55. In Lauren P., the school district provided "piecemeal" accommodations to address the student's behavioral problems that were compromising her education, such as requiring the student to use an assignment logbook, or not penalizing her in some classes for late assignments. Id. at 554. In the present case Defendant Pottstown's behavioral accommodations were more extensive and were applied more consistently with R.J.'s overall special education program than those in Lauren P.

For these reasons, the Court finds that Defendant's management of R.J.'s behavioral issues during the 2006-07 and 2007-08 years was adequate to provide a FAPE. While R.J.'s behavior did appear to decline over the course of the two year period such that the school district may have been required to

take further steps—like conducting an FBA—when creating a new
IEP for the 2008-09 academic year, this issue is moot in light
of R.J.'s departure from the District at the beginning of the
2008-09 year.

### E. No denial of FAPE based on failure to identify secondary exceptionality of "other health impairment" based on R.J.'s ADHD

Plaintiffs assert that Defendant's educational program for
R.J. failed to provide a FAPE because District-designed IEPs did
not identify R.J. as having a secondary exceptionality of "other
health impairment" ("OHI") based on his ADHD. Pls.' Proposed
Findings ¶ 286. The factual record shows that R.J. was diagnosed
with ADHD, Inattentive Type, during a neuropsychological
evaluation conducted in November 2005, and that evaluators found
that R.J.'s ADHD and other cognitive disabilities interacted
negatively with one another. See Neuropsychological Evaluation
at 18. Plaintiffs have demonstrated that this secondary
exceptionality was included in R.J.'IEPs coming from Baltimore,
therefore Pottstown did have a record of this condition when
designing R.J.'s IEPs, even though the secondary exceptionality
did not appear on those IEPs. See Parents' Ex. 4, Baltimore
School System IEP Team Meeting Minutes at 3, Mar. 2, 2006; Test.
of Rita Cohen, Admin. Hr'g Tr. 264-65, May 18, 2010.

While Plaintiffs argue that R.J. was offered a lesser range of services due to this omission, they fail to indicate how R.J.'s educational program would have differed had the secondary exceptionality been identified. Moreover, Plaintiffs do not point to any case law holding the failure to include a particular secondary exceptionality to be a violation of the IDEA. Rather, this case ultimately involves a dispute about the substantive contents of R.J.'s Pottstown IEPs. Therefore, to prove an IDEA violation creating a right to relief, Plaintiffs must show that the IEPs failed to provide R.J. an opportunity to make meaningful progress in his education. Because the Plaintiffs have failed to show how the types of services that Defendant provided to R.J. denied him the opportunity to make meaningful progress, this FAPE claim fails.

F. No denial of FAPE based on inadequate or insufficient IEP goals

Plaintiffs assert that Defendant failed to provide R.J. with a FAPE because it provided inadequate and insufficient IEP goals. See Pls.' Proposed Findings ¶¶ 287-96. In support of this claim, Plaintiffs' expert witness in school psychology and developmental psychology, Dr. Nancy Bloomfield, asserts that the IEPs prepared by Defendant were procedurally defective in part because they failed to include goals for every one of R.J.'s recognized needs. Bloomfield Am. Expert Report at 2, ECF No. 43;

see also Test. of Dr. Steven J. Brooks, Hr'g Tr. 82-87 Sept. 21, 2012, ECF No. 50.

The IDEA defines an adequate IEP as including:

> a statement of measureable annual goals, including academic and functional goals, designed to meet the [student's] needs that result from the [student's] disability to enable the [student] to be involved in and make progress towards the general educational curriculum, and to meet each of the [student's] other educational needs that result from the [student's] disability.

20 U.S.C. § 1414 (d)(1)(A)(i)(II). Plaintiffs interpret this provision as requiring a school district to create measurable goals for every recognized educational and functional need of a student with disabilities. The Court is aware of no prior interpretation of § 1414 (d)(1)(A)(i)(II) which requires distinct measurable goals for each recognized need of a disabled student to provide a FAPE.[58] Moreover, it would again be

---

[58] Plaintiffs have pointed to several instances of non-binding case law for the proposition that denial of "comprehensive goals" amounts to a denial of a FAPE. The Court has found each of these cases distinguishable from the current case.

For instance, Plaintiffs cite Coventry Pub. Schs. V. Rachel J., 893 F. Supp. 2d 322 (D.R.I. 2012). In that case, a district court upheld an administrative finding that failure to set distinct behavioral goals as part of a student's IEP amounted to denial of a FAPE. Id. at 335. That case, however, involved a student with extraordinary behavioral issues, and as such his behavior "act[ed] like a boulder that block[ed] his way from making . . . educational advancements." Id. at 328, 335. At most, that case suggests that failure to assign distinct goals in key areas of non-academic need may deny some students a FAPE. While the student in Rachel J., however, had such severe behavioral issues that failing to set distinct behavioral goals compromised her education, R.J. was able to make academic headway while using behavioral management strategies short of distinct behavioral IEP goals.

Plaintiffs also cite to D.E.R. v. Bd. of Educ. of Borough of Ramsey, 2005 WL 1177944 (D.N.J. May 18, 2005). In D.E.R., the court found that the school district denied a special education student a FAPE by failing to include specific goals in the student's IEP. D.E.R. was a special education student who was put in a mainstream class without being subject to the

54

inconsistent with the longstanding interpretation of the IDEA to find that providing a FAPE requires designing specific monitoring goals for every single recognized need of a disabled student. As noted above, a FAPE is a threshold guarantee of services that provide a meaningful educational benefit, not a perfect education.

It is worth noting that while the lack of goals or progress monitoring for particular areas of need may render R.J.'s IEPs procedurally defective, Plaintiffs have not provided evidence that any procedural defects rose to the level of substantial harm necessary to award the compensatory education or tuition reimbursement sought. The Third Circuit has determined that a dispute about the specific contents of an IEP is a substantive claim. See, e.g., D.S., 602 F.3d at 565. Accordingly, it is evaluated based on whether the IEP provided a meaningful educational benefit. Id. R.J. received some meaningful educational benefit under his October 2006 and 2007 IEPs, even if the benefit was not optimal. Thus, Defendant did not deny R.J. a FAPE during this period and the procedural defects in Defendant's IEPs do not support awarding the relief sought by Plaintiffs.

---

regular graded curriculum or individually designed goals. Therefore, D.E.R. may be distinguished as involving the failure to set goals in the context of placing a student with learning disabilities in a mainstream classroom, not the failure to set specific goals for a student remaining in a special education setting.

G. <u>No denial of FAPE based on inadequate progress</u>
   <u>monitoring</u>

Related to the question of inadequate IEP goals, Plaintiffs assert that Defendant failed to provide R.J. with a FAPE by performing inadequate progress monitoring as part of R.J.'s 2006-07 and 2007-08 IEPs. <u>See</u> Pls.' Proposed Findings ¶ 297. On intermittent dates during these two years, R.J. received reading probes to measure his progress in reading fluency, but no such probes were conducted to measure his progress in other recognized areas of need, such as math, reading comprehension, written expression, or vocabulary.

Plaintiffs' emphasis on this particular deficiency in R.J.'s educational program is misplaced. While regular monitoring of a student's progress towards IEP goals may aid in ensuring that student's achievement of measurable progress over an academic year, a "sub par" progress monitoring scheme does not necessarily imply an inadequate FAPE. <u>See</u> <u>I.H.</u>, 2012 WL 2979038, at *11. Plaintiffs have failed to point to a procedural requirement under the IDEA, or its implementing regulations, that relates to the necessity of progress monitoring. Therefore, the Court finds that Defendant's limited progress monitoring of R.J.'s academic progress is not a sufficient basis to find a denial of a FAPE.

## H. No denial of FAPE based on inadequate instruction, accommodations, and modifications in R.J.'s IEPs

Plaintiffs also assert that R.J. was denied a FAPE while attending Pottstown High School because IEPs designed for R.J. contained inadequate specially designed instruction, accommodations, and modifications for accessing curriculum content. See Pls.' Proposed Findings ¶¶ 298-99.

The record indicates a different conclusion. R.J. received an array of SDIs in his October 2006 and October 2007 IEPs. See Oct. 2006 IEP at 12; Oct. 2007 IEP at 10. The Plaintiffs' cause of action is therefore a challenge to the substance of R.J.'s IEPs, and the merit of this claim turns on whether Defendant provided resources that were reasonably calculated to provide some educational benefit to R.J.

As the Court noted above, a FAPE does not require a school district to provide an optimal or ideal education, and thus Defendant's failure to include all recommendations from the 2005 evaluation cannot form the basis for finding a denial of FAPE. Because the modifications and instructions provided in R.J.'s October 2006 and October 2007 IEPs were reasonably calculated to provide R.J. with some meaningful educational benefit, Plaintiffs' claim regarding deficient SDIs is denied.

## I. No denial of FAPE based on insufficient transition planning and programming

Plaintiffs claim that Defendant also denied R.J. a FAPE by not providing sufficient services and programming to prepare R.J. for a career and independent living, as required under the IDEA. See Pls.' Proposed Findings ¶¶ 300-02. While a school district must provide opportunities for a disabled student to build independent living skills and explore a post-secondary educational or vocational plan, courts in the Third Circuit have emphasized that these requirements are un demanding and are focused more on exposure to opportunities than a promise of a particular outcome. See, e.g., K.C., 806 F. Supp. 2d at 822. The IEPs that Defendant prepared in October of 2006 and 2007 reflect that R.J.'s vocational interests were considered and vocational services were provided, including enrollment in mechanics, computer training, and culinary classes. Additionally, notes pertaining to R.J.'s progress during these two years indicate that his IEP team explored his interest in a possible career path within the U.S. military. As a result, the Court finds that Defendant District did provide R.J. with adequate transition services to ensure a FAPE.

J. No denial of FAPE based on denial of extend school year (ESY) services

Plaintiffs allege that Defendant failed to provide a FAPE by denying R.J. extended school year (ESY) services while he was attending Pottstown High School. See Pls.' Proposed Findings ¶

303. R.J.'s IEPs prepared by the District indicate that R.J. was not recommended for ESY services. Instead, R.J. was offered additional tutoring with his special education reading teacher, Judith Miller, during the summer of 2007. See Email from Rita Cohen to Judith Miller at 2, Jan. 10, 2007 (suggesting that Defendant would consider offering R.J. an in-district summer program in reading with Judith Miller to continue the instruction that R.J. was receiving during the school year); Test. of Rita Cohen, Admin. Hr'gs Tr. 264-65 May 18, 2010 (stating that summer tutoring was offered for the summer of 2007, but that R.J. did not utilize it). Plaintiffs did not take advantage of this opportunity.

As illustrated above, the IDEA does not require that a school district provide ESY services merely due to a student's slow progress or low achievement levels. These services are specifically required where, in the absence of a lengthier school year, a student risks serious regression that would cancel out progress made during the regular school year. See M.M., 303 F.3d at 537-38. All students experience some risk of regression. Therefore, only in the exceptional case, where essentially all progress made during the school year will be lost during the vacation break, are ESY services required. Id. Plaintiffs in the present case have not provided evidence that

R.J. was at an exceptional risk of regression.[59] To the contrary,
R.J. may have been at a lesser risk in light of the summer-time
tutoring offered by the District. While R.J. may have benefitted
from more intensive year-round instruction, particularly due to
his slow progress and special needs, this is not a proper
consideration for whether ESY services were required under the
IDEA. Therefore, the Court finds that Defendant's decision to
not provide ESY services to R.J. is not a basis for finding that
R.J. was denied a FAPE.

K. <u>No denial of FAPE based on inadequate social skills
    training</u>

Finally, Plaintiffs assert that Defendant denied R.J. a
FAPE by failing to provide the social skills training identified
as a significant need in R.J.'s prior evaluations. <u>See</u> Pls.'
Proposed Findings ¶ 304. The record reflects that R.J. did
exhibit some socialization needs as of March of 2006. <u>See</u>
Baltimore City Public School System IEP Team Meeting Minutes at
2 ("[R.J.] has difficulty maintaining peer relationships and
poor coping skills."). R.J.'s records from the Pottstown School

---

[59] The record indicates that in March of 2006, R.J.'s Baltimore IEP team
expressed concern about R.J.'s problems in "retain[ing] material over time."
Parents' Ex. 7, Addendum to IEP Meeting at 3, Mar. 2, 2006. ESY services were
recommended in the Mar. 2006 IEP prepared in Baltimore. <u>See</u> Parents' Ex. 3,
Baltimore City Public School System IEP at 3, Mar. 2, 2006; IEP Team Meeting
Evaluation Report at 3, Mar. 2, 2006. ("Baased[sic] on severity of
disability, regress/recoupmt[sic] skills, and emergent break through of
critical life skills, [R.J.] appears to warrant ESY service."). However,
these concerns were not raised during R.J.'s IEP meetings with the Pottstown
school district.

District, however, indicate that from the summer of 2006 onward, social skills were not a specifically recognized area of need. R.J.'s IEPs reported that he was making progress in socialization and that he was generally well-liked by his classmates. See August 2006 Interim IEP at 2 ("Mr. Coleman states that [R.J.] has vastly improved his social skills and utilizes a variety of coping strategies."); Oct. 2006 IEP at 5; Oct. 2007 IEP at 5 ("[R.J.] seems well liked by his peers and his teachers. His socialization skills are improving.").  For this reason, the Court cannot find that R.J. was denied a FAPE because he was not provided with additional social skills training.

Notably, even if Plaintiffs were able to assert that R.J. was required to receive social skills training at the Pottstown School District based on the recognized need for social skills training made by the Baltimore school system, the failure to incorporate social skills training into R.J.'s IEP would only justify the relief sought by plaintiffs—Compensatory Education and Tuition Reimbursement—upon a showing that R.J. was substantially injured. Because R.J.'s social skills continued to grow while he was at the Pottstown School District, no substantial injury occurred. Thus, no procedural defect existed sufficient to justify the relief sought by Plaintiffs.

VI. CONCLUSION

For the reasons stated above, the Court affirms in part and reverses in part the Decision of the Administrative Hearing Officer.

With regards to Defendant's statute of limitation claim, the Court finds that Hearing Officer's determination—that Plaintiffs may utilize the statutory exception to allege violations occurring prior to May 12, 2007—was incorrect. Pursuant to the Third Circuit's holding in D.K., to justify the statutory exception, a misrepresentation must be knowing or intentional. Because Plaintiffs have failed to prove that Defendant's misrepresentations about R.J.'s progress and needs were more than just negligent, Plaintiffs may not seek relief based on any alleged misconduct occurring more than two years prior to their first administrative filing.

Concerning Plaintiffs' FAPE claims not barred by the statute of limitations, the IDEA's guarantee of a FAPE promises students only the opportunity to make meaningful progress, not with a perfect or ideal education. In measuring what level of educational service a district must provide to substantively comply with the IDEA, courts have stressed deference to a defendant district's creation of goals and programs to satisfy the requirements of the IDEA. As identified throughout this opinion, Plaintiffs have provided a multitude of evidence

suggesting how R.J.'s education might have been improved but they have failed to provide sufficient evidence that R.J. was denied the opportunity to make meaningful progress. Therefore, the Court affirms the Decision of the Administrative Hearing Officer denying Plaintiffs' FAPE claims.

Accordingly, the Court will enter judgment in favor of Defendant and against Plaintiffs on all counts.

An appropriate order follows.